# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 6, 2026

Lyle W. Cayce
Clerk

No. 25-20036

_____

United States of America,

*Plaintiff—Appellee*,

*versus*

Karina Deluna,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CR-610-1

_____

Before Southwick and Willett, *Circuit Judges*.[1]

Leslie H. Southwick, *Circuit Judge*:

Karina Deluna was convicted of repeatedly and falsely stating on federal forms that she was purchasing firearms for herself when she was actually receiving a commission to purchase them for others. On appeal, Deluna challenges the voluntariness of several police interviews, a pair of

_____

[1] After oral argument in this case, Judge Ho entered a recusal. This appeal is being decided by a quorum per 28 U.S.C. § 46(d).

No. 25-20036

evidentiary rulings by the district court at trial, and the reasonableness of her sentence. We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

This case began when Ralph Jones, an investigator with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), received a referral regarding the purchase of eight firearms by Karina Deluna from a pawn shop in Houston, Texas between September 29, 2018, and July 7, 2021. The referral reported that one of those firearms had been recovered in Mexico. The case was further referred to Special Agent Benjamin Bynog in ATF's Houston office. Bynog concluded there were several "strong indicators of straw purchasing" in the referral. Straw purchasing is falsely stating that one is the actual buyer or transferee of a firearm while instead acquiring the firearm for someone else.[2]

Special Agent Bynog, accompanied by a colleague, Special Agent Matthew McDavid, went to question Deluna at her home in Houston. This would be the first of three interviews conducted with Deluna. At no point during the three interviews was Deluna informed of her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Bynog recorded the second and third interviews, and they were later introduced at trial.

---

[2] When buyers purchase firearms from a licensed firearm dealer, they must fill out a portion of ATF Form 4473. *Abramski v. United States*, 573 U.S. 169, 172–75 (2014). ATF developed Form 4473 to implement federal statutory record-keeping and verification requirements imposed on dealers to ensure that they do not sell firearms to prohibited buyers. *Id.* at 173. Making a false statement on the form is a felony under 18 U.S.C. § 924(a)(1)(a). *See id.* at 191–193. Question 11a of Form 4473 asks: "Are you the actual transferee/buyer of the firearm(s) listed on this form?" The form cautions in bold: "Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you." For the purposes of this case, straw purchasing is the false answer "Yes" to Question 11a.

No. 25-20036

The initial interview took place outside of Deluna's home. Bynog and McDavid identified themselves as ATF agents and told Deluna that they wanted to ask her about "some suspicious firearms purchases." According to Bynog, Deluna first explained that she had purchased the firearms for hunting but, after questioning, changed her story and said that she just "liked them" and enjoyed target practice. When the agents asked Deluna where the firearms were, she told them that the weapons were at her mother's home and that her mother was in Colombia. Bynog ended the interview by asking Deluna to call him when her mother returned and the pair could see the firearms.

Shortly thereafter, Bynog learned that another firearm purchased by Deluna had been recovered in Mexico. After an unsuccessful visit to her mother's house to confirm her story, Bynog and McDavid decided to question Deluna once more. The second interview also took place outside of Deluna's home. The agents attempted to be discreet in their interrogation to avoid alerting Deluna's nearby family members to the fact that she was involved in a federal investigation. Bynog, at least, was dressed in plain clothes. The pair methodically questioned Deluna about her story, occasionally indicating disbelief at her answers and prodding her to answer differently. Deluna eventually admitted that she had purchased the firearms for her sister-in-law's boyfriend, Chino. Deluna signed a statement to that effect, confessing that she had purchased eight firearms on Chino's behalf and delivered them to him.

Deluna was not yet arrested. As the investigation proceeded, Deluna became connected to the firearm purchases of Haley Medlin, another subject of an ATF referral. Medlin, too, had purchased a weapon that was later recovered in Mexico. In August 2022, Bynog learned that Medlin was in the process of purchasing a firearm, a Barrett .50 caliber rifle, from an online firearms dealer. ATF staked out the pick-up at a local Houston gun store.

No. 25-20036

When Medlin, along with Deluna and several children, arrived to take possession of the firearm, ATF agents followed her car back to Deluna's home.

Special Agent Bynog and his team detained Medlin in front of the residence and seized the firearm she had purchased. Bynog approached the house and had a final recorded interview with Deluna, the third interview. The agents cautioned during the interview that if Deluna was not cooperative, they could "come back and charge [Deluna] with those things" she had already "admitted," namely, straw purchasing. At one point, Bynog warned Deluna that the agents intended to detain her, and if she was not able to have another family member take care of her two children, ATF would call Child Protective Services to watch them. At the end of the interview, Deluna admitted that Medlin had informed her that she intended to buy guns on behalf of Chino. Deluna also provided written consent for a search of her cell phone. Deluna's phone contained a trove of evidence regarding her purchases with Medlin later used at trial.

Several months later, the Government filed a two-count indictment in the Southern District of Texas charging Deluna with a violation of 18 U.S.C. § 924(a)(1)(A), which prohibits making a false statement with respect to firearms records required to be maintained by a federal firearms dealer, and both Deluna and Medlin with aiding and abetting the same. Medlin pled guilty to the aiding and abetting charge and was sentenced to one year of probation. In 2024, the Government filed a superseding nine-count indictment that charged Deluna alone with one count of conspiracy, in violation of 18 U.S.C. § 371; one count of smuggling, in violation of 18 U.S.C. § 554; and seven counts of making a false statement with respect to firearm records, in violation of 18 U.S.C. § 924(a)(1)(A).

No. 25-20036

In the summer of 2024, the case went to trial. Medlin and Special Agent Bynog were the Government's primary witnesses. Bynog testified on the investigation and the three interviews, while Medlin filled in the details of the straw-purchasing scheme. Medlin explained that she had been engaged to purchase firearms by Deluna's husband, Eric, who ran the enterprise from jail, and that Deluna had facilitated the purchases. The recordings of Bynog's interviews with Deluna, in addition to Deluna's written statement, were important elements of the Government's case.

The jury found Deluna not guilty of smuggling, guilty of conspiracy with the object of making a false statement with respect to firearm records, and guilty of the seven false statement counts. The PSR calculated Deluna's Sentencing Guidelines range to be 87 to 108 months. The court sentenced Deluna to 60 months on one count and 27 months on each of the seven other counts, for a total of 87 consecutive months of imprisonment. Deluna timely appealed.

## DISCUSSION

This appeal presents three issues: (1) whether the district court erred by admitting Deluna's recorded statements at trial; (2) whether the court erred by permitting the Government to introduce prejudicial and irrelevant evidence; and (3) whether the court erred by imposing a substantively unreasonable sentence. We address each in order.

### I.   *Recorded Statements*

Deluna contends that the introduction of recorded admissions from her second and third interviews with Special Agent Bynog was improper because her statements were involuntary.[3]

---

[3] Deluna does not argue on appeal that the confessions were obtained in violation of the *Miranda* doctrine. Accordingly, despite the Government's briefing on the issue, we

5

No. 25-20036

We "give credence to the credibility choices and fact finding by the district court unless they are clearly erroneous," while "the ultimate issue of voluntariness is a legal question" reviewed *de novo*. *See United States v. Alvarado-Palacio*, 951 F.3d 337, 340 (5th Cir. 2020) (quoting *United States v. Mullin*, 178 F.3d 334, 341 (5th Cir. 1999)). The parties dispute whether *de novo* review is appropriate to apply to the issue of voluntariness in this case. The Government insists the standard is instead plain error because Deluna did not file a motion to suppress the recordings, as required by Federal Rule of Criminal Procedure 12(b)(3)(C). Deluna maintains that *de novo* review applies because she sought and received a hearing on the statements. As Deluna's challenge fails under either standard, we assume without deciding that the appropriate standard of review is *de novo*.

Under the Due Process Clause, a confession must be voluntary to be admitted into evidence. *Dickerson v. United States*, 530 U.S. 428, 433–34 (2000). The burden is on the Government to prove by a preponderance of the evidence that the confession was voluntary. *United States v. Restrepo*, 994 F.2d 173, 183 (5th Cir. 1993). An individual's confession is involuntary when "due to state action . . . 'his will has been overborne and his capacity for self-determination critically impaired.'" *United States v. Shows Urquidi*, 71 F.4th 357, 369 (5th Cir. 2023) (citation omitted) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). "A statement cannot be involuntary in the absence of coercive police activity." *United States v. Mendez*, 885 F.3d 899, 910 (5th Cir. 2018). Notably, "the admission of an involuntary confession is subject to a harmless error analysis." *United States v. Clay*, 408 F.3d 214, 221 (5th Cir. 2005). To determine whether a confession is voluntary, a court must consider the totality of the circumstances. *United*

---

do not address our *Miranda* jurisprudence beyond the role that the warnings play in the voluntariness inquiry.

6

*States v. Cantu-Ramirez*, 669 F.3d 619, 625 (5th Cir. 2012). A federal statute provides a non-exhaustive list of relevant factors to consider in the totality of the circumstances, which include:

> (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment,
>
> (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession,
>
> (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him,
>
> (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and
>
> (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

18 U.S.C. § 3501(b).

We address the voluntariness of (A) the second interview and (B) the third interview in turn.

### A.    *Second Interview*

The facts of the second interview are undisputed. Special Agents Bynog and McDavid spoke with Deluna outside of her home. The agents told Deluna she was under investigation for straw purchasing. Bynog was in plain clothes, and a number of people, including family members of Deluna, were nearby. Bynog considered Deluna to have been "cooperative."

Deluna argues that the second interview was coerced because: (1) she was not advised of her right to remain silent or to counsel, (2) she did not have counsel present at the interview, and (3) the agents threatened her

mother.  The Government responds that there is no indication that any agent "cross[ed] any of the forbidden lines that could lead to reversible coercion."

The first two circumstances that Deluna emphasizes — the lack of *Miranda* warnings and absence of counsel — are "relevant only in establishing a setting in which actual coercion might have been exerted to overcome the will of the suspect."  *See Procunier v. Atchley*, 400 U.S. 446, 453–54 (1971).  "[A] defendant who voluntarily gives a statement to law enforcement in a non-custodial situation need not be advised of his *Miranda* rights."  *United States v. Courtney*, 463 F.3d 333, 336 (5th Cir. 2006).

The only possibly coercive police conduct during the second interview was the supposed threat by the Special Agents against Deluna's mother.  The purportedly improper threat occurred when Bynog advised Deluna that her narrative was inconsistent and that the description of leaving the guns at her mother's home was "implicating [her] mother."  This one-off warning is insufficient to show coercion.

We agree with an unpublished opinion of a panel of this court that found threats to indict or arrest relatives are less coercive when "the family member or loved one is plausibly tied to the crime."  *States v. Hall*, 711 F. App'x 198, 202 (5th Cir. 2017) (citing *Allen v. McCotter*, 804 F.2d 1362, 1364 (5th Cir. 1986)).  This accords with the understanding of our sister circuits.[4]

---

[4] *See, e.g.*, *United States v. Hufstetler*, 782 F.3d 19, 24 (1st Cir. 2015) ("Without more, an officer's truthful description of the family member's predicament is permissible since it merely constitutes an attempt to both accurately depict the situation to the suspect and to elicit more information about the family member's culpability."); *United States v. Johnson*, 351 F.3d 254, 263 (6th Cir. 2003) ("[T]he question whether the threat to prosecute [a family member] was coercive turns on the issue of whether the threat could have been lawfully executed."); *United States v. Jones*, 32 F.3d 1512, 1517 (11th Cir. 1994) (finding proper an agent's warning that "unless [the defendant] explained the participation of his girlfriend, she would continue to be considered a suspect").

In *Allen*, the published case that *Hall* relied on, we held that the threat of "a possible good faith arrest" of a relative was not coercive. *Allen*, 804 F.2d at 1364. Special Agent Bynog's admonition, in effect, reminded Deluna that she was tying her mother to the straw-purchasing crime.

Other factors we routinely apply when judging the totality of the circumstances — including the "location," "duration," and "hostil[ity]" of an interrogation — also counsel against coercion here. *See Shows Urquidi*, 71 F.4th at 370; *United States v. Boche-Perez*, 755 F.3d 327, 343 (5th Cir. 2014). The interview took place at Deluna's home over the course of an hour and a half, while she was surrounded by family and at least one of the agents was in plain clothes. *See Cantu-Ramirez*, 669 F.3d at 627 (finding similar circumstances to be indicia of voluntariness). The agents told Deluna of the reason for the interview, and she was already familiar with Bynog and McDavid. The recording of the conversation captures a lively back-and-forth, as Deluna narrates and the agents question. We decide, after a consideration of the totality of the circumstances, that this interrogation did not "overwhelm [Deluna's] will" and that Deluna's statements were voluntary. *See id.*

The district court did not err in permitting the introduction of Deluna's statements from her Second Interview.

B.    *Third Interview*

Deluna also asserts that her confession in the third interview was involuntary. There is little doubt that the circumstances of the third interview were more coercive than those of the second. Similar to the prior

_____

interview, Deluna was not warned of her *Miranda* rights.  This time, the interview occurred shortly after ATF agents arrested Medlin in Deluna's front yard.  Special Agent Bynog and another ATF agent, Special Agent Tyler Settelen, interviewed Deluna inside her residence and in front of her family.

The content of this interview was more coercive, too.  At one point, Settelen threatened to "come back" and "charge" Deluna with the crimes she had already admitted to if she did not cooperate.  He admonished Deluna that lying to a federal agent in the performance of official duties is a felony.  Earlier in the interview, Special Agent Bynog had asked if a nearby eighteen-year-old family member was able to watch Deluna's child.  Then, after Deluna continued to give inconsistent answers, Special Agent Bynog warned that if Deluna did not give the eighteen-year-old permission to watch her children, "[W]e'll call—what's it called?  DCFH?  And we'll have them come out and take care of the kids while you're going with us."  Special Agent Bynog added, "You are, you are detained."  After repeated prompting by the officers, Deluna eventually admitted that she knew Medlin intended to buy the firearm on behalf of Chino.

The threats to have an agency "take care" of Deluna's kids, the implication that Deluna was going to be charged if she did not cooperate, and the statement that Deluna was "detained," may have been enough, combined with the lack of warnings regarding her rights, to constitute improper coercion by the ATF agents.  We decline to decide that question here because the admission of the third interview was harmless error.

A "defendant's own confession is probably the most probative and damaging evidence that can be admitted against him."  *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139–140 (1968) (WHITE, J., dissenting)).  We may find an error

harmless only if, after "review[ing] the remainder of the evidence against the defendant," we conclude that "the admission of the confession was harmless beyond a reasonable doubt." *Id.* at 310. We will not reverse a conviction if (1) "the wrongfully admitted evidence was cumulative" and (2) "the untainted proof of the defendant's guilt was overwhelming." *See Delaware v. Van Arsdall*, 475 U.S. 673, 682 n.5 (1986). Both elements apply here.

First, the third interview was cumulative: the Government introduced two other confessions at trial, each containing "all the ingredients of the crime." *See Harrington v. California*, 395 U.S. 250, 254 (1969). The recording of the second, voluntary interview begins with Deluna admitting to taking money to purchase guns on behalf of someone else, *i.e.*, straw purchasing. Sometime during that second interview, Deluna also signed a written confession admitting to the same. The statement included the disclaimer, "I made this statement freely and voluntarily." While Deluna objected to the admission of the writing at trial on voluntariness grounds, her brief does not mention the confession, nor cite it in the record. Deluna has thus forfeited any challenge to the introduction of the written confession. *See United States v. Wadi*, 153 F.4th 465, 473 (5th Cir. 2025), *cert. denied*, No. 25-7177, 2026 WL 1513302 (U.S. June 1, 2026).

The only novel part of the confession in the third interview was that Deluna knew of Medlin's straw-purchasing activities. But that was also duplicative of trial testimony. Medlin herself testified at length about Deluna's awareness of and outright assistance with her straw purchases. The Government presented a panoply of documentary evidence corroborating Medlin's testimony: text messages between Medlin and Deluna discussing the purchases; emails from an online gun dealer to Deluna, listing Haley Medlin as the purchaser; photographs from Deluna's phone of Medlin's shipping receipt, cashier's check, mailing label and driver's license.

Second, the untainted evidence of Deluna's guilt was overwhelming. The two prior confessions, Medlin's testimony, as well as the texts, emails, and photos found on Deluna's phone, all support the conclusion that Deluna purchased guns on behalf of others for money. Our conclusion is also strengthened by the Government's use of the confession. *See Fulminante*, 499 U.S. at 297–98 (considering the Government's reliance on a confession at trial in the harmless error analysis). For example, the Government spent little time in its closing statement on the third interview. The Government diminutively summarized Deluna's confession as: "Defendant eventually admits that she was going with Medlin to get the firearm, but really kind of denies involvement and minimizes her conduct." Rather than resting its case on the confession, the Government urged the jury to instead consider the evidence found on Deluna's phone which "completely undermine[d] her version of what happened that day." The Government treated Deluna's third confession, in her third interview, as unnecessary to the case, and we agree.

An additional indicator of harmless error is that the issue of voluntariness was before the jury. When the voluntariness of a confession is vigorously contested during trial and the jury is instructed on the issue, any error in its admission is more likely to be harmless because "[t]he jury in making its ultimate decision must have concluded that the confession was voluntary or that [the defendant] was guilty without considering the confession." *See United States v. Bell*, 367 F.3d 452, 462 (5th Cir. 2004).

This case is similar to *Bell* in both relevant respects: the voluntariness of Deluna's confessions was thoroughly disputed before the jury and the jury received an instruction on voluntariness. For an example of the former, Deluna's counsel expounded in the opening statement:

> But here's the other thing that Mr. Smith did not tell you during his opening statement, is that at the end of this trial you will receive an instruction, and you will determine whether her statement was knowingly and voluntarily made. Here's what he didn't tell you. That young woman right there, the ATF, the agents, threatened her to charge her mother, to take away the kids that she was taking care of, including putting them [in] CPS custody, and they broke her. They broke her. They got what they wanted.

As the involuntary statements, if any, were "cumulative," "the untainted proof of the defendant's guilt was overwhelming," and the jury had the issue of voluntariness before it, we conclude that the introduction of the third interview was harmless beyond a reasonable doubt. *See id.* at 462; *Van Arsdall*, 475 U.S. at 682 n.5; *Harrington*, 395 U.S. at 253–55.

## II.   *Evidentiary Rulings*

Deluna also challenges several evidentiary rulings by the district court. Specifically, the district court's overruling of her objections to the introduction of (A) a physical Barrett .50 caliber rifle seized by ATF and (B) twelve photographs of firearms taken from her phone. This court reviews evidentiary rulings for "abuse of discretion, subject to a harmful error analysis." *United States v. Sanjar*, 876 F.3d 725, 738 (5th Cir. 2017). District courts have "wide discretion in assessing the relevance and prejudicial effect of evidence." *United States v. Rao*, 123 F.4th 270, 282 (5th Cir. 2024) (quoting *United States v. Alaniz*, 726 F.3d 586, 606 (5th Cir. 2013)).

### A.   *Physical Firearm*

Deluna unsuccessfully objected to the physical display of the .50 caliber Barrett rifle under both Federal Rules of Evidence 401 and 403, arguing relevance and unfair prejudice. She reasserts these arguments on appeal.

13

"Evidence that is not relevant is inadmissible, and even relevant evidence may be excluded 'if its probative value is substantially outweighed by a danger' of 'unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" *Rao*, 123 F.4th at 281–82 (citation omitted) (quoting FED. R. EVID. 403).

Deluna contends that the Barrett rifle was larger than the other firearms she purchased and not representative. She argues the display "was intentionally designed to influence the jury to make a determination based not on whether paperwork was filled out truthfully, but on the implied danger posed by Appellant." The Government responds that the rifle was "the last firearm purchased and which Deluna and Medlin picked up after ordering it online" and "part of its case-in-chief." In addition, "the firearm was not only relevant to the ATF Form 4473, conspiracy, and smuggling counts, but the jury was going to be asked whether the Barrett firearm should be forfeited."

Deluna cites only a few out-of-circuit opinions for her contention that the admission and display of the rifle was improper. *E.g.*, *United States v. Klebig*, 600 F.3d 700, 716 (7th Cir. 2009); *United States v. Elmowsky*, 501 F. Supp. 3d 236, 241 (S.D.N.Y. 2020). Even Deluna's most helpful case, *Klebig*, did not establish a *per se* rule against the physical introduction of firearms at trial. 600 F.3d at 716. Instead, the Seventh Circuit decided a prosecutor's introduction of two dozen firearms was improper when "physical specimens of a limited number of the guns" would have sufficed. *Id.* Deluna's proffered authority does not aid us in deciding this issue.

As the Government emphasizes, this circuit has permitted the display of a demonstrative firearm to the jury that "was not the actual firearm used by the defendant." *United States v. Weeks*, 919 F.2d 248, 253 (5th Cir. 1990). The trend in our sister circuits, too, is to allow the display of a limited number

of weapons relevant to the offense. *See, e.g.*, *Klebig*, 600 F.3d at 716; *United States v. Perrotta*, 289 F.3d 155, 166–67 (1st Cir. 2002) (concluding a district court did not abuse its discretion by admitting three handguns, brass knuckles, a fake bomb, and a billy club into evidence). Here, the Barrett rifle was certainly relevant: it was one of the firearms about which the Government sought to prove Deluna had lied. Moreover, the jury was considering whether she should forfeit the weapon. As the First Circuit explained, "seeing is believing." *Perrotta*, 289 F.3d at 166 (quoting 2 John W. Strong et al., McCormick on Evidence § 212 (5th ed. 1999)).

We find there to be insufficient prejudice from the display of a single firearm, however imposing, to outweigh the probative value of seeing relevant evidence. The district court's ruling was not an abuse of discretion.

B.    *Photographs*

Deluna next argues that the admission at trial of twelve photographs of firearms that had been found on her phone was improper because the photos were irrelevant to the case. The photographs depicted firearms not the subject of her indictment. She adds that the Government's stated reason for introducing the photos, to "show familiarity with firearms," was improper because "[a]ppellant's familiarity with firearms, or lack thereof, has no bearing on whether she made false statements on Form 4473." The Government, meanwhile, responds that "Deluna's knowledge and intent also were highly relevant to the charged counts in the superseding indictment to which she pleaded not guilty," especially the charge of smuggling for which Deluna was acquitted.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. We agree

with the analysis in an unpublished opinion of this court supporting the relevance of photographs like those at issue here. *See United States v. Chapa*, 609 F. App'x 264, 264–65 (5th Cir. 2015). In *Chapa*, a man convicted of conspiracy to possess with intent to distribute and possession of a firearm in furtherance of a drug trafficking crime appealed the introduction at trial of photographs of other firearms, not those found with the drug trafficking paraphernalia, discovered on his cell phone. *Id.* at 264. The court concluded the disputed photos "tended to support the probability that Chapa was in possession of the firearms ... rather than, as he contended, simply an innocent bystander." *Id.*

A similar line of reasoning applies here. An element of Deluna's defense to the smuggling charge was that she had not been aware that selling guns across the border was wrongful. The photographs made it less probable that Deluna was indeed clueless about firearms and thus the restrictions on their exports. They also, like in *Chapa*, made it less probable that she was simply an innocent unwittingly caught up in the straw-purchasing conspiracy. The district court did not abuse its discretion by allowing the photographs into evidence.

### III.    *Substantive Unreasonableness of Deluna's Sentence*

Deluna contends that her sentence, 87 months, was substantively unreasonable. Deluna preserved her objection to her sentence by arguing for a lower sentence in the district court, so we review her challenge under the abuse of discretion standard. *See United States v. Fatani*, 125 F.4th 755, 761 (5th Cir. 2025). This review is "highly deferential." *Id.* (quoting *United States v. Simpson*, 796 F.3d 548, 557 (5th Cir. 2015)). A sentence within the guidelines is presumed to be reasonable. *Id.* To contest that presumption, the defendant must show the sentence: "(1) does not account for a factor that should have received significant weight, (2) gives significant weight to an

irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors." *Id.*

Deluna asserts three reasons why her sentence was substantively unreasonable despite being within the Guidelines range: (1) her sentence, in aggregate, exceeded the statutory maximum for any individual conviction for making a false statement; (2) her sentence exceeded the average length of sentence for similar offenses; and (3) her sentence was strikingly longer than the sentence imposed on her codefendant, Medlin.

All of these asserted errors are foreclosed by precedent. *See United States v. Lucas*, 157 F.3d 998, 1001 (5th Cir. 1998) ("The total punishment can be more than the maximum statutory penalty for any particular offense if the defendant is sentenced on multiple counts."); *United States v. Willingham*, 497 F.3d 541, 544–46 (5th Cir. 2007) (rejecting reliance on national sentencing averages to show disparity); *United States v. Devine*, 934 F.2d 1325, 1338 (5th Cir. 1991) ("[A] disparity of sentences among co-defendants does not, without more, constitute an abuse of discretion.").

Taken together, the aggregation, the above-average sentence, and the disparity between Deluna's and Medlin's punishment do not demonstrate a clear error of judgment by the district court in balancing the sentencing factors. In addition, Deluna has not shown that the district court relied on an improper sentencing factor or failed to account for a proper sentencing factor. Therefore, Deluna has not rebutted the presumption of reasonableness. *See United States v. Rodriguez*, 41 F.4th 728, 731 (5th Cir. 2022). The district court did not abuse its discretion in sentencing.

AFFIRMED.